We have the Fresenius case, and I wonder if we could ask the appellant to step to the microphone and let us know how much time you'd like to reserve for rebuttal. Three minutes, please, Your Honor. Three minutes it is. Please proceed. May it please the Court. My name is Amy Manning, and I represent Fresenius Kabi. This case is about a monopolist who used exclusive deals to lock up active pharmaceutical ingredients, delay generic competition, and raise the price of a life-saving 100-year-old drug from $4.27 in a competitive market to over $165 per vial in a monopolist market. It's also about this Court's precedent in Wellbutrin, which taught that a plaintiff, an antitrust plaintiff, attempting to establish causation in the face of patents, needs to put on evidence from which a jury can conclude that it is more likely than not that the patent challenger will be the patent. Let me ask you this question. Can we decide this case without delving into the patent issues in the first instance and just on the issue of whether there's any competitive conduct and, as a consequence, antitrust injury? Can you decide the appeal on that issue? Yeah. Can we sidestep, if you will, the patent issues and go straight to the question of any competitive conduct and antitrust injury, or do we need either in the first instance or with a remand to the district court to deal with the patent issues? Well, I think that there is no question that we've demonstrated antitrust injury in this case. Ultimately, to prevail in the case, we will have to show that the patents would have been invalidated or found not infringed. But in this case, the judge didn't even take a look at the patent evidence at all, even though that's what Wellbutrin says. And Wellbutrin, in fact, said the court must consider the underlying patent dispute to determine causation. So it will be a necessary part of the case, no matter what. I think there's no question about antitrust injury being established here. We demonstrated that generic entry was delayed. But wasn't it Presenius's decision not to move more quickly? In part, they declined to engage with other API suppliers? No, Your Honor. They engaged with many other API suppliers. They had already started with their development with BCN. BCN had committed that it was going to support its ANDA. We had gotten stability batches using BCN's samples. Let's put aside BCN for the time being, because we understand that your position is there was an exclusivity arrangement that precluded you from getting any more BCN products. But there's a couple things that we need to talk about. One is the opportunity that BCN reportedly offered your client to, you know, allow itself to get the same benefit. They were willing to, to your account, offer BCN, and Presenius declined. So how could a reasonable juror conclude that it was PAR's fault that you couldn't get access to BCN's products in light of that exchange? So I don't think that Presenius Covey declined to bid. As soon as it occurred that PAR was pursuing exclusivity, we did. Presenius Covey asked over and over for semi-exclusivity. Please still support our LOA. In the meantime, we were also reaching out to other API suppliers that went to Polypeptide and went to Botkin. They were both locked up in exclusive deals. It kept asking for semi-exclusivity over and over. But there's an email that says explicitly that there was willingness to consider a counteroffer, and Presenius declined. That's BCN, but that's not the only supplier. There were others who were prepared to offer samples and other APIs such that, in 2015, that would have enabled the development process to continue, and the record further demonstrates that that activity, that wasn't going on, that the management really wasn't proving that until much later. So how do you reconcile those events with your contention that it's PAR's fault you couldn't get into the market? Yes, John. So for instance, for example, or to start with, Presenius Covey, they were asked if they wanted to bid on exclusivity, right, not semi-exclusivity. We kept asking about semi-exclusivity. BCN kept saying, do you want to bid for exclusivity? PAR's expert conceded that that would have been futile because PAR is a monopolist. They have a pile of money related to being a monopolist, and the expert conceded that PAR would always outbid. It would always outbid everything that we had. In addition to that, we couldn't bid for exclusivity. They were working with BCN, and they were the RLD, and that was the only API supplier that was approved to support their drug. So if we had tried to get them in an exclusive, not only would we have had our own tortious interference problem, we may have had other issues because now you've taken the API supplier for the only drug supporting the market, taken it away, and now you may have delays in getting the drug out to patients. Tell me why BCN was the only available source. I know your view about polypeptide. I know your view about Botcan at the time, but they were tied up. Put those guys aside. This record has other API suppliers available in the marketplace. In fact, we know others made the product, Eagle, et cetera. Do you know your record? I'm not going to recite your record to you. You guys know your record back and forth. And as a result, I'd like you to explain how a reasonable juror could conclude that it was Parr's fault that you were blocked. And then I have another question about the API market. Well, go ahead. All right. So as an initial matter, it's Parr's fault because Parr is a monopolist, and as this court talks about in some of its exclusive dealing cases, it broke the competitive process because it could always outbid as their expert concedes. There were other potential API suppliers out there. Our expert looked at them, and they were either not interested very early in the process or hadn't started yet. And when we're talking about delay of generic entry, that is really important because those people, while they might have been available, they weren't going to prevent delay. In, I think it was LePage's or one of the exclusive dealing cases, they talk about the critical bridge, right, to entering the market. Here, the critical bridge were DMS holders. Why DMS holders? Why did it have to be DMS holders and not non-DMS holders? We know from the record, Presenius has used non-DMS. It's not a condition precedent to be able to get an ANDA approved. So tell me why that distinction is so significant to you. So when someone has a DMS, they already have a manufacturing process. They already have a product that you can then put into a formulation and then put on stability so that you can develop the product. If they don't have the product manufactured yet, you've already got time that's running. And while Parr points to these other people that were able to file ANDAs later on, if you look at the timeline, we were ready to go in the middle of 2016. The next filer did not file for almost two years. So Parr was successful in its attempt to lock these people up in exclusive deals. And probably the most probative evidence altogether of the importance of the DMS holders is that Parr admitted publicly on an earnings call that it was locking up the API supply and that was going to be its block to competition. In a May 5, 2016 earnings call, Mr. Campanelli of Parr was asked about competition on Bay District, which is their brand name, and were there competitors coming? And Mr. Campanelli responded and said, we are well protected on our API source. And this is at 943 to 44. And it's right there that they say, we have an exclusive on our API and we're well protected. And the answer was to competition on our API source. And the analyst comes back and says, no competition in the guidance? And Mr. Campanelli responds, yes, no competition in the guidance. So the fact that Parr entered into three exclusives, and again, they didn't need those exclusives. Their expert testified to that as well. There was no need for an exclusive deal. There was no capacity constraint. These API suppliers were still allowed to supply people outside. So the fact that Parr worked with three API suppliers that all had DMS, in essence, essentially demonstrates just how important a DMS is to getting on the market fast. But it's not required, right? Because we know Eagle got on the market, I know you're saying in 2018, with the same API suppliers you guys used, that you then switched back to back them. You're not asking us to hold that if you get the DMS supplier, that's anti-competitive, right then and there, even if there's others in the marketplace. Assume I hypothetical. There's DMS suppliers, there's non-DMS suppliers. Defendant lost off all the DMS suppliers. Is your position that this court should hold that that is anti-competitive conduct, even though there are other non-DMS suppliers available? Yes, Your Honor, I would. And I go back to the court's holdings in Lopeges and Densply and VF Meritor, where we talk about the critical bridge. There's a great quote in Densply, where the court is citing a treatise, and it talks about when a monopolist can engage in strategic exclusive deals to delay arrival. That's exactly what happened here. And just because there are other people that are there, other opportunities, that doesn't take away the anti-competitive effect. In Densply, the district court had been critical of the competitors in the market, saying that they had other rights, right? They could have gone direct, they weren't competing aggressively, etc. And the Third Circuit, in reversing the district court, said no, just because something is possible doesn't make it something that could correct the anti-competitive problem. But we aren't in the world of possibilities here, are we? I mean, we know what the API market was. What we don't have in the record, and which I think is part of a plaintiff's obligation, is, I think there's arguments in the appellee brief and then in the reply brief about this concept of upstream and downstream. We don't know what percentage of the upstream market, if we call that the API market, is unavailable. Do we? Is there evidence of the percentages? I don't think there's any reason or any requirements under this court's precedent to calculate the percentage. In LePage's report, did not calculate a percentage foreclosure. And in Z.F. Meritor, this court said there is no one test for evaluating legality of exclusive dealing agreements. And we have to look at the competitive market as a whole. That's also, I think, in Z.F. Meritor, where it says you have to look at everything that is happening, the competitive dynamics of the market as a whole. And let's slow down for a second. From your point of view, what's the market? And I don't mean to monopolize this, gentlemen. Jump in. Oh, great. Well, if you'd like me to jump in, I'm happy to jump in. If I could just get the answer to that one question on market. What is your market? The market was stipulated, too, in this case, that it is the ultimate market for vasopressin. And those were the markets identified with Pages and Z.F. Meritor. It was the ultimate market was the market that the court was considering. I've enjoyed our conversation. I'll let others ask some questions. Thank you. I'm sure it's going to be resumed, Counsel, so don't worry. But I'll give you a respite to hear a different voice. I have some questions about DMF as well. So is it your position that if you are a non-DMF supplier, you are essentially not viable, and that that is creating the gap you're talking about between 2016 and 2018? I'm at my 12 minutes. May I answer?  Okay. Okay. What's important here is the anti-competitive effect is the delay, right? When we talk about a monopolist, we don't want them to maintain their monopoly, to delay entry so that prices go down. And so a DMF holder, a non-DMF holder at the time when we're talking about delay is not viable because it's going to be anywhere from a year to three years before they're going to be ready to be the basis of an AMBA filing. So there's sort of a sliding scale of whether or not they are in the market and available to supply. And here, we had BCN, then we had Polypeptides, and Bakken, who were locked up in exclusive deals. And the ones that we went to when we tried to find somebody else to assist us, they didn't have DMF. Some of them just dropped out. We ended up with three of the ten that we reached out to. One of them had technical issues, another one dropped out, and the other one, we didn't like how some of their safety issues looked when we inspected the plant. So they eventually became available. They eventually became available for EGLE to file. But they were not available, they were not there to fix the competitive problem at the relevant time. Let me ask this question. So you're making your ANDA application. You say that these particular suppliers that we've been talking about are not viable. But they have, obviously, enough API so that you could present whatever you needed to present in your ANDA to the FDA. Is that right, or is that assumption wrong? No, that assumption is wrong because, first of all, they have to have API that is of a level. Sometimes they have lab samples, but that's not sufficient. They have to have them that are manufactured under good manufacturing practices, et cetera, that we can then formulate the product. Then it has to sit for six months of stability testing. So there is a natural delay that is happening. And that's exactly what PARM was going for. They wanted to delay and keep the prices up as long as they possibly can. And that's an injury to the market. That's an injury to payers. That's an injury to patients. And that's exactly the intent that they revealed in that earnings call when they were asked about competition. They were well protected on their API source. They had taken BCN. They had sort of blocked the exits with polypeptides and with BACN. And the other ones that were out there were a long way away from being in a position where somebody could formulate a product, get it ready to go, and get ready to file an ANDA. Okay, so I'd like you to focus on 2015 for a moment and BCN. I want to make sure that I understand your anti-competitive conduct argument with regard to PAR and BCN attitudes. So you'll correct me if I have my dates off, but essentially if we look at April, the April-May period in 2015, PAR meets or discusses with BCN exclusivity, right? Now, at that point in time, you are entering into an invoice with BCN for some supply? Yes. Okay. Yes. And then if I understand the timeline, in July and then again in December of that year, 2015, you approach BCN to continue supplying you, and they inform you of an exclusivity arrangement they have. Whether it's detailed and they say who, I don't think we need to get into, but they inform you that they cannot because of that. Is that right? There's a couple of dates that are important to put in there. So in January of 2015, and this is reflected in the record at 53-29-30, BCN agrees to support our ANDA in giving us an LOA, right? So we are starting in that process. Then we go through some back and forth. We order the samples. They talk to us in July. They say, hey, we're being pursued for exclusivity. We come back and say, how about semi-exclusivity? They basically say, we'll try that. There's back and forth. They're giving us some technical information. The disability badges start fitting. We keep asking for semi-exclusivity. We reach out to BACM. We reach out to Polypeptides. They say, sorry, we're already in exclusive deals. We reach out to others. We're still trying to figure something out. But in that process, BCN is being, I would say, pressured by PAR to enter into the exclusive deals. And if you'd like to look at that document that reflects the pressure by PAR, it's reflected at 32-62, where they keep coming back. And in the meantime, BCN is somewhat concerned about its reputation. It's made this commitment. And in addition, there's a case in which PAR lost the LOA from its API supplier. Let me interrupt you there for a second. Let me interrupt you there for a second. So I understand the back and forth. I've got a sheet that has most of those things in it, too. But the question is, why should we look at this series of events as PAR dominating BCN, rather than PAR on one side, percentage on the other, and BCN in the middle? And going back and forth. And there are, at least theoretically, several results that could happen. Both PAR and Persenius could receive supply. Persenius could get all of the supply, although I think you've talked about these are not the reasons why that's unlikely to have happened. Or PAR could get it all. But why isn't that, or why shouldn't that be considered a competitive environment in which, you know, Persenius just happened to lose? The third circuit's precedent requires that a competitor have a fair opportunity to compete. There was no fair opportunity to compete. PAR is the only RLD. It's a monopolist. It's making, it scales up over a number of years, 350, 400. It's in public filing, 400 million on this drug, right? So they can always outbid us. So no matter how many times, how many ways we ask them for semi-exclusivity, or if we ask for the exclusive, they will always outbid us as a matter of economics. And so it's not a fair fight,  And I say fair fight because there's a fair opportunity to compete. Just as it wasn't a fair fight in dental fly. When the district court was saying, look, these other competitors, they didn't fight hard enough. They didn't try to go direct to dental lab. The third circuit reversed this record on that saying, if you don't have a fair fight, it's not an actual opportunity to compete. And that's exactly what was happening here. But does that mean that every time a generic is trying to enter the market and it can't get the supply that it needs to make its own entry viable, that that's going to be a per se antitrust? Well, okay. I don't want to use per se in that sense. But that's going to automatically be an anticompetitive conduct? No, that's not our position. You're going to have to look at the specific facts issue here. The fact we say absolutely get us over the line. And frankly, it just brings out the fact that this is probably a fact question for a jury to look and see, did we actually fight for BCN? And our multiple requests for semi-exclusivity, did we have a fair opportunity to compete? Or was this a situation where you have the monopolist that has all the advantages has the ability to pressure and coerce. And we don't have that ability because we are not even in the market yet. And it goes right along with this course precedent on exclusive deals. So it's not going to be every time. And it's certainly not non antitrust per se, but otherwise per se role. But I think it's also an issue for a jury to consider. Just one question. If other companies were able to procure vast oppressive API ahead of you, would you still have an antitrust injury? Well, if they had been able to get it ahead of us, they would not have gotten it from Polypeptide or Bakken or BCN, the ones that had the DMS. And even if they had gotten it from a non-DMS holder and the delay still happened, we would still have antitrust injury. Because again, you would still have delay in the market. Because we were ready. We could have entered in the middle of 2016. And because we weren't, PAR was able to maintain its monopoly, which is a classic monopolization plan. Just a permutation of Judge Fuentes' question. Let's say that PAR had sought exclusivity only with BCN. And I understand your arguments about Bakken and Polypeptide. Let's just put that aside for a moment. So only seek exclusivity with BCN. And with regard to Polypeptide and Bakken, they do not. Would there still be any competitive conduct and antitrust injury in that hypothetical? I believe there would be, Your Honor, because under, again, this court's exclusive dealing precedent, sometimes the exclusion of one competitor can be enough to impose an injury on the market. I think our damages may be cut off earlier if that had happened. Because there would have been other opportunities. And the delay may have been less. Because we would have been able to go and get these other entities. But there still potentially would have been an anti-competitive effect and anti-competitive injury. Even with multiple competitors? I'm sorry, Your Honor, I said many? Even with multiple competitors? Many, many competitors? I mean, if there were many, many competitors at the same time as we were trying to get on, obviously that changes the dynamic significantly. That was not the case. We were the one that was ready to go. We had been in the market before PARC had gotten its NDA and the FDA had asked others to get out of the market. It was the two of us competing. And PARC knew that, right? They knew exactly who they needed to go after to maintain their monopoly as long as they could. It was just the two of you? It was just the two of us right before the FDA asked us to get off the market. If I could ask a question about the NDA process. Under the regime where the first guy who files the NDA requires others to leave the market, is there a period of exclusivity granted to the NDA holder, like there is, you know, contact Hatch-Waxman? Tell me about that. No. It's just general NDA. There may be some special circumstances, but generally you get the NDA and then as soon as somebody can file and get a generic on the market, you're off and running. Okay. The second question I had has to do with, we do know there are others who are trying to make this product using the end of process. Have any of them brought suit claiming that PARC was such a monopolist that it delayed their entry into the market or any other claims about this exclusivity? Are there any other lawsuits challenging their conduct? Not that I'm aware of, but I also don't know if they were as close to getting on the market as we were. I don't know if they were subject to the PARC conduct in the same way that we were. We know that EGLE didn't file until almost two years later, but they may have not been ready to go as we were ready to go before they yanked the LOA from us. And what is it that, when you say you were ready to go in 2016, what we do know from the record is there was a period in time where folks were told to sort of, kind of, sort of stand down, take it off. We had some budget sheets that make some suggestion that the management wasn't fully supportive. Eventually it comes on board. Was it like April 2015-ish? September 2015-ish? It was 2015 that they approved. What facts in the record tell us, and I don't want to hear about the experts but for, I want to know what facts tell us that you would have been ready in 2016? All right. January we asked BCN for support. We start getting their samples. There was some holdup in the import of the samples. We get the samples. We do the formulation, which we have to do with their samples. We put them on stability batch testing in October. We actually put them on six weeks early. They were supposed to go on a little bit later. They went on six weeks early. We're doing some technical back and forth while the conversation is happening about the potential exclusivity. That goes all the way through the stability batches sit all the way through. You can see the documents in the record. I mean, there's tons of documents about the different stability things. It shows the formulation. It shows the pH. It shows all of those things. Getting ready to file, and then we find out that we've lost the LOA. And everything that we would need, right, for the jury to make this look at the ANDA is there, right? That's a different question. I'm going to ask you about that in just a second. One sec. The record also reflects that during this same period, there is communication with other sources. So it's not like you're putting all your eggs in BCN basket. Because it's clear that your client was looking for alternatives. We have the emails from Blagine and John. That's how it's pronounced. So you might have been ready to go, but it looks like you were, you were finding alternatives at the same time, correct? Well, I mean, we want to get on this market, right? And we're starting to see that we're having this back and forth with BCN. We would face a non-mitigation of damages argument, I think, if we had not actually looked for some other alternatives. So we had an obligation to do that. I should also add to your question about what evidence is in the record. We also have Moll's declaration. Dr. Moll, who is the head of generics, who said this is what we were doing. And frankly, the lawsuit demonstrates that President Salve was trying to file this product and wanted to do so by mid-2016. And this kind of segues into what you were about, because I wanted to keep the patent discussion separate, if you could. Uh-huh. As I understand your view about Wobrutrin, basically the District Court has an obligation to examine your non infringement claims. Right. With respect to the non-infringement point, was there a draft ANDA that someone would have looked at and there would have been, that the District Court could have looked at, and if we just had a blank thing, you know, we don't have a supplier for the API. Because the concern I would have is if we send this back to the District Court and say, well, Wobrutrin requires you to do this examination, the District Court's like, I don't have an ANDA to compare. There wasn't active infringement by the filing of an ANDA, which, you know, that's a fictitious act of infringement that gets everybody off and running to the District Court. But what is it that Her Honor was supposed to have done? I mean, everything that is necessary for the non-infringement analysis is there. The formulation, the pH, the degredants, everything you would look at to determine the non-infringement position is there. There's nothing, the only thing that was left was some paperwork. None of that is important to a non-infringement analysis. So everything is necessary. I mean, the Court focused on an ANDA. But that takes Wobrutrin, which is basically an instruction for causation, and turns it around for the benefit of the antitrust violator, and basically says as long as you can prevent the actual filing of the ANDA, you're home free. It doesn't matter if you have weak patents. It doesn't matter that activists said that weak patents are not a block in the chain of causation. You're home free. And that seems like it's completely inconsistent with everything about the ANDA to protect competition. It just moves it back. It says instead of entering into settlements, et cetera, just prevent the ANDA filing and you're fine. And so that as a qualification seems inconsistent with the ANDA trust clause and this Court's precedent, which says you need to be able to do the assessment. But the evidence that was needed to do the assessment and our experts did it was there. I understand the position. Thank you. Okay. So just to follow up on the patent stuff. So your position is everything was there for a more fulsome analysis by the district court. But I just wanted to check on one thing. The district court speaks of an alternative that you had, which was to go the IPR route. And I want to make sure that I understand. Your argument on the IPR route is there isn't a full overlap of the arguments you could make before the district court, as opposed to before IPR. Now, I think I understand that the lack of written description cannot be brought before the IPR. Is there anything else that can't be brought before the IPR? Non-infringement also cannot be brought before the IPR. Okay. But that's essentially not a viable strategic alternative because you don't have the same consideration of the issue. Right. And the other thing about that is, you know, that was just one of our theories of how we might've invalidated the patents was to file an IPR, but that was in the but-for world. And the court converted that to an actual world obligation, which also seems inconsistent with the antitrust laws for two reasons. Number one, it imposes additional costs on the victim of the antitrust violation to have to go through this process as opposed to proving it in their case. And it also creates more delay in a case that's about delay. Their expert testified that an IPR from the time of filing is about 18 months and then potentially another year plus on appeal. So you have more delay on top of delay, a generic entry, which is what the case is about. So that seems inconsistent again with the antitrust laws and none of the other cases, anybody can file an IPR. You don't have to have particular standing to file an IPR. In all of the other reverse payment cases, no one has ever, no judge has ever said that they need to file an IPR and go and figure out the patents before they make arguments about the invalidity of the patent not being a break in the chain of causation. Let me ask you this question. Let's just deal with this hypothetical for a moment. Let's take one of the API, the potential API suppliers, which you argue were not viable at a point in time in 15 into the beginning of 16, okay? It doesn't matter which one. And they are not viable at the moment that you approach them at that time, but they would be in, I think you alluded to two years for one of them. Let's just assume two years. Okay. And let's assume a world in which in two years, you actually begin production with, with, with them. You go through the whole process. Is the theory of your, uh, any competitive conduct and therefore antitrust injury, the, the, um, how the, uh, market is affected from the moment in time that you don't have a viable API supplier to the moment in time when you do, is that the period where there's antitrust injury, or is that not the way to think about it? I mean, the way we, the way we put it forth in our theories of damages, essentially, which is what this goes to is the period of time where we were prevented from filing the ANDA, when we would have filed the ANDA and started the clock running on approval to use a number of different marking points, right? One was, let's say a reasonable, um, filer had gotten API and filed the day of, or the day after Eagle. That is one way to measure it. Another way to measure it is the difference between when we would have filed and when we did file, we have a number of different models that are in the damages. And so it's so that, so we measured, we can measure the delay a number of different ways. And that's why in the hypothetical of that, if we had gotten back on our polypeptides, we might've had a shorter amount of time for damages. Okay. Thank you. Uh, do you have anything, sir? Oh, let me see. Um, I can't hear you. I'm sorry. Can you hear me now? Yes, I can. Thank you. Um, part claims that you need to show a significant position in both the API. Um, yeah, the API and the injection markets. Uh, are you able to do that? Can you. So they, they argue that both markets needed to be defined, but this course precedent does not require that at all. It was not defined and does fly on pages. Um, and in CF Meritor, there was only one market. It was the ultimate market. So there is not a requirement to define two markets. Um, our expert did look at the API market, did assess, um, what was available, et cetera. So we did go through that and they talk about substantial foreclosure, but foreclosure is essentially a proxy for looking at harm to the market. And here we have harmed the market and all of the reverse payment cases, the harm is the delay. And so we don't really even need the foreclosure analysis because we know that the market is going to be affected.   I think that's all I have to say. Great. Got your response. Thank you. Uh, just Schwartz. Do you have anything further? I'm good. Thank you. Great. Thank you. Uh, council. And let's, uh, let's hear. Uh, from council for FLE. Uh, thank you, your honor. Good morning. May it please the court. Ben Bradshaw from Melvin and Myers for the defendant. Your honor. The antitrust laws are designed to protect competition and to ensure that firms have the opportunity to compete. The antitrust laws do not guarantee a right to success in the marketplace. So let me ask you this question. So, um, who in your view populates the market of VASA price in, uh, API supply? Well, we, anybody who actually provide, uh, manufactures the product potential entrance under this court's precedent in the Smith client case, any potential entrance should be included. So it would at a minimum include any suppliers, regardless of whether they have a DMF or not. And it would include potential entrance entrance that could potentially enter the market. And your honor has hit on something that is exactly a flaw with respect to what the business has shown here. We don't know. It's not just a question of definition of the market. And we would take issue that there was, there is a requirement to define the market because you have to show that in that upstream, you have to show that part cut off a substantial portion of the market. Does it? Otherwise, how are you able to execute on any exclusionary? Okay. Great. That's a great point. So let me, from that fabulous point, ask you this question, right? So the argument is that that definition should be BCN polypeptide and bottom, right? Because they were the only viable suppliers at the time and any other prospective manufacturers were not capable of manufacturing market-ready API at scale, right? So tell me why that's not an adequate definition of who the prospect, the viable manufacturers of API and, and who, how would you redefine that? And then who would be others that we'd have to consider as we think about that? The first thing I would say, your honor, is Presidio has not presented any evidence on whether it's the DMF holders or whether it's beyond that. So we don't know who the providers in that market, that's their obligation. Now they say, counsel says that it should be limited to GMF holders. There's no evidence for that. That's strictly an assertion. And it's inconsistent your honor with commercial realities. We know it is commonplace for drug manufacturers to reach out, to work with non DMF holders in order to secure API, develop the product, because all it has to have is that the DMF is on file at the time the ANDA is provided. So it happens all the time. So what I want to say, your honor, and we even know in this case, that Presidio went to, albeit late, they went to non DMF holders to find out about supply. So their own behavior tells you that non DMF holders, if they can manufacture, if they have the capability should be included in that market. Well, give me an example of a non DMF holder. He would have the capacity to supply theoretically. I'm just, you know, we're in the theoretical world for a moment because it seems to me, I'm not a scientist, but just thinking about it, right. If I'm a, if I'm a non DMF holder, then I'm working as a scientist, working with a potential manufacturer in a hypothetical world. And my hypothetical world is, I think this works. I think I can make supply, but I'm not sure. Now, if I understand your argument correctly, you're, you're saying, well, judge to be enough because manufacturers deal all the time in this hypothetical world of a non DMF holder. We think it can work. We have to go through the steps to make sure that it can. So help me with trying to understand. It has the best way I can say your honor is it happened in this case. There were, there were would be kind of mass oppressive manufacturers who were able to obtain supply API supply from non DMF holders. And ultimately those non DMF holders were able to get a DMF because your honor, a DMF, the FDA went a DMF filing. There's no substantive review of the DMF. It's just that they've checked the boxes of the paperwork essentially to be filed. So API suppliers, they have to have an arrangement where they know they can produce the product they're going to make the investment and, and file for the DMF. So let me ask you this hypothetical. Okay. On this very point, because I think you're doing a good job in, in, in helping me with this. Let's assume for a moment, not your clients, of course, but let's assume for a moment that there's a manufacturer that has indeed engaged in any competitive conduct. Right? So it's a hypothetical. So don't get your hackles. The, the, the, the, the patent holder in my hypothetical has glommed onto the only manufacturer out there. There's only one and now that's their API supplier. Okay. There's one other potential API supplier. They, they, they, they have no supply. It's all theory. They're not going to get on for a couple of years. Okay. You're with me on my hypothetical. Okay. So, so my question is in that circumstance, right. Is there is, is, is that, and you know, they, the, this hypothetical patent holder has cut off all access to the API supplier by anyone else in, in that hypothetical, is that any competitive conduct that would lead logically to antitrust injury? Yes, your honor. If the plaintiff could show that there's been substantial foreclosure in the downstream market. So I hope I answered the question. Only one supplier of the, if there's only one API supplier using judge Greenway hypothetical, there would have to be foreclosure because you couldn't complete the chain couldn't sell it without the API. Right. That, that, that, that, that, that's correct. So in other words, the question is if the defendant or if a manufacturer locked up 100% of the API supply, complete total foreclosure, would that be sufficient? Well, likely, likely it would. However, and I just want to come back to this because this is a theoretical discussion in this case, we do not know. There's no evidence on which suppliers are in that market. In fact, Presidio is completely washed as a tan says we don't need to do that, which we disagree as a matter of law, but there is no disagreement as a factual matter that a reasonable jury could not determine that par locked up the API market. I keep hearing. I mean, as a theoretical method, you, you, you've got to, well, you don't have to read anything, but as it relates to this case, I mean, they've set forth that you, you cut off their access to BCN at a point in time. And the same with regard to polypeptide and Bakum. I, I, and I've seen nothing in the, in the record that anyone besides those three, and you'll tell me if I'm wrong, I'm sure you will. That anyone other than those three were either DMF holders or able to supply API. Is that wrong? That's wrong because they were at the time it's, it's half right, half wrong. Okay. The right part is at the time, the only DMF holders were BCN, polypeptide and Bakum. What's wrong is that there weren't any other non-DMF manufacturer suppliers who were ready, willing and able to provide the API supply. In fact, we know that that's the case because ultimately other manufacturers, other vasopressin manufacturers were able to obtain API from those. So I really just have to say that this distinction, your honor, that somehow the DMF is the golden ticket. And the only thing that you should look at when you're looking at who's in the market of an API supplier is simply incorrect. And it's. Who was using our record. We'll stay away from the hypothetical, whatever it is in our record show there were non-DMF API suppliers who were viable. And that's make this case different than the second circuit's decision in Geneva. Who is that? Well, I can say without HEMO, was a viable supplier of API. In fact, it now has a DMF. Who else? Anybody else? IMS, which is another entity, which now has a DMF. Forget about the DMF for the moment. Just forget about the DMF because what I'm trying to get a sense of is at this relevant period for the plaintiff, which is that 15, 16 period, because they say their representation is, they would put on evidence to say in 16, we would have been ready to go. Had we had a proper supplier who was available at that time to them. Aurobindo is another API supplier that was available. There was whole host. The three that you've just mentioned, just to follow up on judge Swartz, they HEMO, IMS and Aurobindo. I have the feeling or the sense that you're talking about that. They have a DMF now. Are you saying that they had a DMF back in 2016? No, but they were available. They reached out and Fresenius made its own determination about whether or not it wanted to contract with those suppliers, but they were available. CS Bio is another one that was available at the time. I do want to make this point. The availability of API supply, again, it's not an issue that creates a tribal issue of fact, because what we have in this situation is we don't know because there's no evidence. We don't know the portion of the upstream market for which part allegedly locked up. That is undisputed. Was there a discovery taken on that point? Was there any discovery taken on that point? The only discovery with respect to the available note, there was no discovery taken of potential API suppliers, none. Well, I mean, there had to be some discovery because you just told me. I'm sorry, your honor, discovery, discovery from those, there wasn't any third party discovery of potential API suppliers. There, there is evidence in the record. There's, there's lots of evidence in the record suggesting the back and forth, suggesting where API suppliers are saying we're ready, we're able, we're willing and presenting a saying for whatever reason, no, we're not going to do it. Let me ask you this question because it's right in this wheelhouse. So I'm not taking you off your, your, your, your point or the questions that that judge Schwartz is asking. So you're talking to us about HEMO, IMS, Arbindo, CS Bio.  I know it's second circuit as concerns API supply. Shouldn't we disregard any potential supplier that can not produce GMP grade API at scale? And if my understanding of the facts are at the times that we're talking about, none of these potential manufacturers or suppliers could say that. Am I wrong on that? Am I thinking about this the wrong way? I don't believe that any of the suppliers that we've talked about categorically could be eliminated from consideration based on their ability to ultimately produce API supply. In fact, we know because they've now several of them have DMS. So I think that the answer in this, going back to Geneva, look, that case, in fact, there was, there was evidence that the upstream market, that there was a substantial portion of that market that was locked up, that was tied up. There were two markets that hasn't, there's no evidence here. Now I really want to touch because we're taught, this is all in the context of foreclosure. We could not disagree more with Fresenius' reading of the ZF Meritor, the Dentsply and the LePage's cases. In those cases, this court has clearly stated that exclusive contracts do not give rise to anti-competitive or antitrust concerns unless they substantially foreclose the relevant market. And in this case, the relevant market is the market for vasopressin. Even conduct that disadvantages a single competitor is not sufficient. There must be, and the court, this court and ZF Meritor could not have said it more clearly. And I'm going to read it because the court says it better than I can. What page are you reading from? I'm on page 271. Give me one moment. And I want to just take one step, one step backwards first before I read the quote, which is the ZF Meritor case specifically said what courts and economists universally agree on, which is exclusive contracts generally pose little threat to competition. They are generally considered pro-competitive. So now to page 271 of the court's decision in ZF Meritor, and I quote the legality of an exclusive dealing arrangement depends on whether it will foreclose competition in such a substantial share of the relevant market. So as to adversely affect competition later on that same page, ZF Meritor says exclusive dealing arrangement is unlawful only if the competition is merely assessing competition rather than merely disadvantaging rivals. Conduct in an exclusive dealing case, even conduct that might disadvantage a single rival is not actionable. There must be substantial foreclosure of competition. Delay is not enough. And there's no with respect to the other manufacturers. Remember six manufacturers, six under the exact same market conditions that Fresenius claims prevented them from filing their ANDA, have obtained API, have filed ANDAs and are poised to enter the market. That is the opposite your honors of market foreclosure. Okay. So let's just stay on your foreclosure point for a moment. I mean, we can't, we can't accept your statement in a vacuum, right? Because just because at some point in time that happens doesn't mean that in the intervening time there was no antitrust injury. Just bear with me as a theoretical matter. You'd agree with that, right? Well, I'm not, I'm not sure I understood what the theoretical statement was your honor. Well, the theoretical statement is if they're on the foreclosure point, right, just because there are entrants at a later point in time doesn't mean that there wasn't a period where there could have been anti-competitive conduct leading to antitrust injury. I mean, the fact that at some point somebody gets in the game, it's dispositive of the question of whether there was at a point in time, any competitive conduct. That's my point. That is correct. If, if there is evidence that relates the delay or the alleged injury to the competition, reducing aspects or the exclusionary conduct here, there is not a shred of evidence, none with respect to Sandoz, Eagle, Aurobindo, American Regent, all of the entities that have filed and are poised into the market. There is no evidence that their filings were delayed a single day because of any exclusionary conduct. There's been no timelines. We have no evidence that, Oh, they would have filed in October of 2017 but they were delayed because of harsh conduct. There's nothing. So, so to answer your question, Your Honor, and I hope that I've answered it. Theoretically, yes, you're right. But just because something happened, that doesn't mean that a point in time, but antitrust injury, the Atlantic Red Shield case by the Supreme Court, antitrust injury only exists if it's connected to the competition, reducing aspects of the defendant's behavior. Well, yeah, I'm understanding your position. Can you talk about Professor Arita's point about the distinction between exclusive dealing and output contracts? Yeah, they're just flip sides of the, of, of, of the same thing. And in fact, the court, again, this court in the VF Meritor case, okay. So in an examining and exclusive arrangement, there has to be a substantial portion, either of the upstream supply market or downstream output market. It's just flip sides of one another. In fact, VF Meritor dense fly and look pages. Okay. Those were exclusive distribution cases. Okay. Ours is an exclusive supply case, but the principles still hold the same. If the competitor, and again, I would go back to the VF Meritor case, and this is on page 284. Exclusive and exclusive arrangement is likely to pose a hype, a competitive threat. If the contracts quote, foreclosed so large a percentage of the available supply or outlets that entry in the continued operation of the concentrated market has been reasonably constricted. And are you relying on those words to support your position that your adversary has a failure of proof because it didn't demonstrate from the evident entry record of foreclosure either at the API supply level or participation in the vast oppression distribution level? Yes, absolutely. That's the proposition you want us to lean on to say there's been a failure of proof because there hasn't been this. Yes. The required to yes, your honor, because we would contend that under this court's precedent in VF Meritor dense final pages, there has to be evidence that a portion substantial portion of the upstream market has been foreclosed. Why is there a stipulation essentially between the way it's recited in the expert reports or even the complaint and the response to it, that the market, the relevant market here is the vast present injection market, as opposed to what you're calling the upstream and the downstream market. How do we reconcile that? Well, because the relevant market for competition, because we are relevant competitors in the vast oppressive market. So the relevant market for showing substantial foreclosure is in the vast oppression market. That is the, because that is the market in which was any claiming it was unreasonably  exclusive dealing case where you're talking about vertical supply, the mechanism in order to show how the exclusionary conduct caused the anti-competitive effect requires as a simple common sentence, it requires that far has somehow cut off the supply and somehow locked up supply. I keep hearing it back. The first page of presenting us as briefness appeal says are cornered the API market. There's no, there's no, we don't, there's no evidence that we've cornered the API market. Let me ask you this question on this particular point, right? So there's an internal par email and I forgive me. I don't have the page site, but the quote is coming up. This internal par email stating that exclusivity with polypeptide would quote become more important if we reach exclusively with BCN because many of the BCN customers will turn to them on this question of, of no evidence. What, how should we read and interpret that quote? Well, the, the, the question of whether or not there were exclusive arrangements with polypeptide and Hawkins Hawkins, we don't, we would contend that there is disputed. We don't, our position is there. We're not exclusive contracts with polypeptide or with Bauckham, but we would concede that there is a disputed issue, but that disputed issue is not material. Your honor, it's not material to any of the arguments that we are making, not the no antitrust injury argument, not the foreclosure argument, not the no causation. You don't have to quote me on that point. I do have the AP site. Sorry, I didn't mean to interrupt your honor. Let me help you with respect to antitrust injury and your honors. First question of this hearing. The answer is, can we, can this court avoid the patent issues by affirming summary judgment on the ground of antitrust injury? Yes, absolutely. Why? Because the race tires case, this court's decision and race tires confirms that when an antitrust plaintiff decides not to compete for desired business, that does not and cannot rise to the level of antitrust injury. In this case, regardless of any exclusionary conduct in this case, Fresenius had every opportunity to compete for BCN's API supply. Despite multiple invitations from BCN and despite the express recommendation of its global head of portfolio strategy, that it make an offer for semi exclusivity to BCN and an offer which would have included substantial milestone payments. Fresenius' top brass said, no, we're not going to do it. We are unwilling to compete. We're unwilling to make an offer. Why? Because they didn't want to get into a bidding war because they thought they were entitled. Your honors, under race tires summary judgment should be granted explicitly on the point that there's no disputed issue here. Fresenius never bid, never made an offer. Now they have a lot of, they take issue with race tires. They say, okay, well, the monopolist is different. Not so. In race tires, Hoosiers the defendant had a 79% share. The fact that pars has market power doesn't hold water. Next, they say, okay, the fact that they didn't make an offer, it shouldn't be because part coerced BCN, this argument of coercion. Your honors, race tires specifically address this idea that offering more money is a form of coercion. It is not offering. And you have Joe Greenaway, you hit it right on the head. BCN was in the middle and BCN was doing a good job playing par and presenting it's off against each other, trying to get the best deal that it could offering more money is not a form of coercion as the race tires case at any more. So then a competitor coming in and offering a discount in order to take share. Well, suppose, suppose the issue wasn't more money. Suppose it was exclusivity, but it, but, but it, but it's because you're versus semi exclusivity. Well, well, well, I think what, I think what you said was in race tires, it said offering more money isn't dispositive. Got that. The question is, uh, you, you mentioned, uh, earlier that, um, they had offered semi exclusivity and that, um, the city has had the opportunity to compete on a semi, uh, exclusive basis. And my question is if the retort by par is exclusive and therefore foreclosure, why is that problematic? It doesn't matter under race tires. Race tires was exclusive, whether it's semi exclusive or exclusive, it is undisputed. Presidio has never made an offer. It, it shows it. Presidio has chose not to compete. It chose not to go out into the marketplace, which is what the antitrust laws encourage and compete. And an unwillingness to compete does not constitute antitrust injury. And your honor, it doesn't matter if it's semi exclusive or exclusive, they had the opportunity to bid on a semi exclusive. And in fact, like I said, I seen your executive specifically recommended it. And they said, no, no, I want to. Well, well, let me, let me, let me cut you off for just a second and ask my colleagues whether they, uh, they, they have questions. Cause we, we have, uh, uh, sort of, uh, neglected the light for quite some time, but I want to make sure they have their, their questions. Judge Fuentes. Thank you. No, no. Okay. Thank you. And judge Schwartz. Just one question on the patent issue. Um, well, butren requires an examination. The district court suggested it was impossible to do because it was too speculative because no lawsuit was filed. But as I understand the record before the district court on the patent patent validity or invalidity challenges at work, the district had everything she needed in front of her to make a judgment on that subject. So did she err by declining to do so? And if not, why not? I don't believe you're on. I don't think it's accurate to say that the district court did not examine or assess the underlying patent issue. In fact, she did. She examined Mr. Thomas's expert opinion. Mr. Thomas is the expert who says that there's a 90% chance that Virginia's would prevail in hypothetical patent litigation involving a product that doesn't exist. The district court examined that testimony and found that it was not grounded in actual evidence, concrete outcomes, concrete facts, and she rejected it appropriately so because it was too speculative. So the suggestion that well, butren requires, and we would agree. Well, butren requires that the district court assess the underlying patent that was done. Why was Dr. Tom, not Dr. Professor Thomas's opinion rejected because it wasn't grounded. First and foremost in an ANDA. I mean, George Schwartz, I think you asked the question about the draft ANDA. There is no draft ANDA. We don't have a draft ANDA. We don't have any of the elements that would go into a draft ANDA. And so the product and the product formulation is purely, purely speculative. So if there was, if you hypothetically, let's pretend you were, you were just doing your patent case. If you're, are you saying you could not, your client couldn't say to you based on these facts, bring a patent case, bring an infringement claim. And you'd have to say to them, sorry, I don't have enough facts. We can't do it. Couldn't satisfy rule 11. Absolutely. We do not know what the formulation would have looked like. And Mr. Dr. Tarantino, who is the technical expert, I'm getting a little bit, I kind of want to keep these things straight, but Dr. Tarantino plaintiff's own infringement experts. He didn't do that analysis either. He did not do, even with respect to the two, three, nine patents, the one patent here that everybody agrees. Okay. Because it has a pH range from 3.5 to 4.1. And this non-existent hypothetical product, the presidents claims that it would have filed a stand on has a 3.5. So it's within, there's no question. Dr. Tarantino didn't do an element by element comparison. And I suspect the reason why is because he doesn't know what the product is. Then on the two, three, nine, how can you argue that you've affirmatively, that there's infringement? Well, we would argue that it's infringement on a lot of different grounds, but specifically because the pH of this hypothetical product falls within the two, three, nine patent. The two, three, nine patent says pH between 3.5 and 4.1. Okay. The whole debate here is because the actual product that Fresenius developed and filed a stand on has a 3.8 pH. Okay. So the, but they're saying in order to avoid all of the non three, two 39 patents, they're saying it's gotta be 3.5, but there's no question that it would fall within and that it would then be. So it's clearly within the pH range and infringement would absolutely be a condition now. So I hope that answers your question. I do want to, because while Buterin is so critical with respect to the causation argument, right? Again, antitrust injury foreclosure, we believe we're entitled to summary judgment, and no disputed issue doesn't involve the patent, but with respect to Wellbutrin. I'll give you 30 seconds on Wellbutrin and that's all she wrote. Okay. Thank you, your honor. Wellbutrin didn't announce any summary judgment rule. Wellbutrin, this court in Wellbutrin rejected expert testimony that was not grounded in facts. Nothing in Wellbutrin says that just because you have an expert who opines about something, that speculative expert testimony, that's not grounded in actual evidence, actual concrete evidence can create a genuine issue. Thank you, your honor. That's, that's all that I have. Appreciate your time. Thank you. Thank you. And now we'll hear from counsel for appellant. It seems so long ago, I barely remember what you look like, but that's all my fault because you know, I asked too many questions. So let's, let's, let's hear from you. And I think counsel, we ostensibly have three minutes, but this is Greg. Sorry for interrupting. I did. I think that you are now unmuted Ms. Manning. Okay. Thank you so much. All right. I have four points if time permits. The first on the DMS versus non-DMS questioning, I'm going to go to this court's precedent in a couple of cases. So in ZF Meritor at 270, this court said the primary antitrust concern with exclusive dealing arrangements is that they may be used by a monopolist to strengthen its position, which may ultimately harm competition. And then then fly. The court refers to a set of strategically planned exclusive deals that may slow arrivals expansion. That's at one 91, it's citing a treatise and the document three, two, six, two answers are intense and it's coercion. And that's why at one night at one 91, the court also says the test is not total foreclosure, but whether the challenge practices bar a substantial number of rivals or severely restrict the market's ambit. And then that's like talking about the pages said, there are other ways. There were other ways across the river, but the retailers in that case were the most critical bridge. And that's what we look at. And here it's DMS holders. That were the critical bridge as evidenced by a joint appendix, like three, two, six, two. Three more points, but I'm going to ask you a question. So we'll get back to your three points. Your adversary made this point and I'd like you to comment on it. Because as he alluded to race tires, he made the point that Fresenius never made an offer and never competed. Now you you'd agree that if we believe that to be so your client would not be in a good position. So tell me what your most effective response to that is as it relates to his use of race tires. Right. Okay. So with respect to race tires, I mean that case is completely distinguishable there because there were pro competitive justifications for the exclusives. They had one set of tires to make the races safer and to make them more fair here. There's no pro competitive justification for these exclusives. That PARS expert conceded that fact at point at 3002. They didn't need exclusives. There's no basis for that. There was no capacity constraint. They could have done a contract with all three of them and allow them to still even just give an LOA so somebody could get their hand on file and even switch to somebody else. So there was no need for that. So it's completely distinguishable from race tires from that standpoint. Second, with respect to willingness to compete. First of all, again, it would not be good if you did not think we tried to compete. I think we did with the semi-exclusive, but again, in this court's precedent, feudal, you know, here we tried many times with semi-exclusive. And if you want to see BCN's concern about the exclusive, you can see that at 3275. Additionally, there was an issue related to an exclusive that I alluded to in my opening. And there's testimony. I don't have the record side, unfortunately for that, but where both Dr. Maul and Michael Schoenhaufen talk about the fact that if they had tried to get an exclusive when they knew that, and they knew BCN was supplying PAR and PAR is the only entity that has approval to supply the market, that they would have been taking away the API supplier for the only company that can provide this lifesaving drug. I mean, this drug is given to people who are dying. And so they did not think they could compete in addition to the fact that it would have been illegal because it would have been tortious interference themselves. And so then we just do here on a different kind of lawsuit and the antitrust laws do not require somebody to break the law or to put themselves in a lawsuit in order to compete. Additionally, they said there was no discovery on other non-DMF holders. And again, I don't think the non-DMF holders are the critical bridge, but there was a ton of discovery on what Fresenius did to reach out to others. They reached out to, I think it's either nine or 10 others. It's detailed in the record. They looked at three of them, one dropped out, another one had technical issues. Another one, ultimately, we inspected their factory and saw that they were stirring things in an open spot. The other thing that's important to note is the first DMF that was not VACM, polypeptide or BCN was not filed until October of 2017. And at the very least, the availability of these other API suppliers is a question of fact to the jury. That's what was found in Geneva. Now council talked about the fact that two markets were identified in Geneva, the API market was defined, but that was because there was a lawsuit in that case, the antitrust lawsuit against the API supplier related to API supply. So there needed to be a definition of a market for that antitrust case. Lastly, they say there's no evidence of a product, and yet they say that there's an issue with the 239. Dr. Tarantino did in fact do a claim by claim analysis of the patent. And in addition to the invalidity case, the centerpiece of which was a Lithuanian patent from 1999 that identified the same problem and had the same solution, a pH of 3.8 that Parr claimed was the magic pH in his back and forth with the patent and trademark office to get his patent. So that would be invalidity and obviousness claim, but he did do a claim by claim analysis with respect to the 239. We do not believe that the district court applied both Utrecht and did the assessment that the third circuit has said must be done in determining causation where patents are at issue. And for that reason we ask that the court reverse the district court and remand the case. Thank you so much. Very short question. It's a comment made by Mr. Bradshaw, Ms. Manning, and the comment was that antitrust injury occurs only if traced to anti-competitive behavior by Parr. And he says there wasn't. Could you respond to that? Well, obviously your Honor, I think that there was significant anti-competitive conduct by Parr as evidenced by their public statements of it, that they were lacking of API or that they were well protected on their API source. And antitrust injury in this case comes from the delay. So there is antitrust injury to the market because prices are high and that those prices continue to be high to this day because nobody has entered the market. You would say that's purposeful delay. Absolutely. I believe it was purposeful anti-competitive conduct and percentage copies injury derived from that because it was not allowed to get on the market. And the minute the generic enters the market, prices start to fall. So I absolutely believe that percentage copies injury derived from the anti-competitive conduct that's alleged here. Judge Schwartz. Thank you. I'm good. All right. Wonderful. Thank you both. Really stirring arguments. Important case. We'll take the matter under advisement.